**UNITED STATES of America, Plaintiff,**

v.

**RAPOCA ENERGY COMPANY, Defendant.**

Civ. A. No. 83–0038(A)(R).

United States District Court, W.D. Virginia.

July 23, 1985.

Robert S. Moore, Knoxville, Tenn., Morgan E. Scott, Asst. U.S. Atty., Abingdon, Va., for plaintiff.

Elsey A. Harris, III, Norton, Va., for defendant.

## MEMORANDUM OPINION

TURK, Chief Judge.

This case, involving the question of ultimate liability for payment of reclamation fees by operators of coal mines, is before the court on cross motions for summary judgment. The government contends that the defendant, Rapoca Energy Company, as the owner of large coal reserves in Buchanan, Dickinson, and Wise Counties, Virginia, is obligated to pay, pursuant to the provisions of the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201 *et seq.*, a reclamation fee of thirty-five cents per ton of coal produced by surface mining and fifteen cents per ton of coal produced by underground mining. Rapoca, however, asserts that it is the forty-eight independent companies with whom it contracts to mine the coal that should be held ultimately liable, for it is only they who fall within the statutory definition of "operator" contained in Section 1291(13) of Title 30 of the United States Code. Thus, the ultimate issue for consideration is whether a large coal company that contracts with independent companies to produce coal that it owns or leases is an "operator" responsible for the payment of reclamation fees.

Section 402 of the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1232(a) (1982) ("the Act"), requires all "operators" of coal mining operations to pay a reclamation fee, per ton of coal mined, to the Secretary of the Interior. "Operator" is further defined in section 1291(13) as "any person, partnership, or corporation engaged in coal mining who removes or intends to remove more than two hundred and fifty tons of coal from the earth within twelve consecutive calendar months in any one location. 30 U.S.C. § 1291(13) (1982). Rapoca argues that it is not an operator within the meaning of the statute since it is the independent mining companies, and not Rapoca, that physically remove the coal from the earth. According to Rapoca, the only situation which would allow liability to fall on it would be if its agents or employees were to remove the coal. Since these mining companies are not employees of Rapoca, but, rather, independent contractors, Rapoca argues that it may not be held liable for any reclamation fees.

Under Virginia law, two factors are necessary in order for an agency relationship to be established. First, "it is necessary that [the agent] be subject to the [principal's] control, with regard to the work to be done and the manner of performing it." *Whitfield v. Whittaker Memorial Hospital,* 210 Va. 176, 181, 169 S.E.2d 563, 567 (1969). "Actual control, however, is not the test; it is the right to control which is determinative." *Id.* Second, "the work has to be done on the business of the principal or for his benefit." *Id.* In addition, the mere fact that these companies are termed "independent contractors" is not a conclusive indication of the relationship between the parties. *Chandler v. Kelley,* 149 Va. 221, 141 S.E. 389 (1928); *Murphy v. Holiday Inns,* 216 Va. 490, 219 S.E.2d 874 (1975). "What the parties call themselves is immaterial; the law looks to the actual relationship between the parties." 1A Michie, *Michie's Jurisprudence of Virginia and West Virginia,* § 12, p. 543 (1980). In the present case it is undeniable that the work performed by the "independent contractors" is done "on the business of" Rapoca or "for [its] benefit". Rapoca Energy Company owns or leases all of the coal being mined and merely contracts with the mining companies to extract the coal. The mining

companies are not free to sell the coal which they extract to the highest bidder, but must instead bring it to Rapoca's facilities, where they are paid a fixed rate per ton of coal delivered.

Thus, the only question to be determined is whether Rapoca Energy Company has the right to control the work done by the mining companies and the manner in which they perform it. Here, Rapoca's method of developing and maintaining the coal reserves indicates such a degree of control. Rapoca surveys its mineral holdings to determine what locations are suitable for coal mining operations. It then performs all preliminary engineering work for the site, including the engineering work required for a surface mining permit. In addition, Rapoca begins the actual site development work, which includes building or improving access roads, constructing sedimentation ponds, and facing up the coal seam.

During the course of the mining operations, Rapoca provides all engineering and mapping services for the contractors. The contractors follow Rapoca's engineers' directions relative to the placement and method of driving entries, the pulling of mine pillars, the location and use of haulings inside the mines, and any other matter pertaining to the protection of the mine and the securing of the greatest amount of coal possible.

■ The day-to-day conduct of the coal removal operation is the responsibility of each contractor. They are responsible for the hiring, supervising, and firing of their own employees, for the acquisition and maintenance of their own equipment, and for the provision of their own fuel, parts, and other supplies. This is not a conclusive indication that the mining companies are "independent contractors", however, for an agency relationship impliedly carries with it the authority for the agent to use all means necessary for the accomplishment of the work to be performed.

Finally, the manner of payment also indicates that the relationship is that of principal and agent rather than one of owner and independent contractor. Once the mining companies have removed the coal from the ground, they must bring it to a processing facility owned by a subdivision of Rapoca. These companies are then paid a fixed amount for every ton of coal delivered. This amount does not change with day-to-day fluctuations in the market price that Rapoca is receiving for its coal. Rather, upward or downward adjustments are made from time to time to reflect the overall market trend. The lack of freedom to sell the extracted coal to anyone other than Rapoca, along with the lack of day to day fluctuations parallelling the market price of coal, is strong evidence that the relationship is one of principal and agent, for it shows direct control over the mining companies. Where the relationship that of owner and independent contractor, the mining companies would undoubtedly be free to sell to whomever would pay the highest price, with only a royalty per ton of coal mined or percentage of the sales price being remitted to Rapoca.

Because of the degree of control which Rapoca Energy Company exerts over the mining companies with respect to crucial aspects of the mining process, along with the corresponding lack of freedom regarding the mining companies ability to sell to anyone other than Rapoca, this court must conclude that the "independent contractors" are no more than Rapoca's agents. Thus, it is Rapoca Energy Company that is liable for payment of the reclamation fees.

■ Were the question of agency not raised, however, the factors enunciated in *Parsons v. Smith*, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959), for determining the entity entitled to claim an allowance for depletion of mineral deposits, would persuade the court to find that Rapoca Energy Company, and not the independent mining companies, is liable for payment of the reclamation fees. The *Parsons* opinion covered two consolidated cases with similar facts. In each the owner of coal-bearing land entered into a contract with a mining company which provided that the company would strip-mine the coal for a fixed price per ton. The ultimate question to be decid-

ed was whether the mining companies had an "economic interest"[1] in the coal in place, and were thus entitled to the depletion allowance, or a "mere economic advantage derived from production, through a contractual relation to the owner, by one who has no capital investment in the mineral deposit." *Parsons*, 359 U.S. at 222, 79 S.Ct. at 661. The Court looked to the following seven factors in determining that the mining companies had only an economic advantage in the coal in place and thus were not entitled to claim the depletion allowance:

> (1) that the [contractors'] investments were in their equipment, all of which was movable—not in the coal in place; (2) that their investments in equipment were recoverable through depreciation—not depletion; (3) that the contracts were completely terminable without cause on short notice; (4) that the landowners did not agree to surrender and did not actually surrender to [contractors] any capital interest in the coal in place; (5) that the coal at all times, even after it was mined, belonged entirely to the landowners, and that the [contractors] could not sell or keep any of it but were required to deliver all that they mined to the landowners; (6) that [contractors] were not to have any part of the proceeds of the sale of the coal, but, on the contrary, they were to be paid a fixed sum for each ton mined and delivered, which was, as stated in *Huss*, [255 F.2d 600] agreed to be in full compensation for the full performance of all work and for the furnishing of [labor] and equipment required for the work"; and (7) that [contractors], thus, agreed to look only to to the landowners for all sums to become due them under their contracts.

*Parsons*, 359 U.S. at 225, 79 S.Ct. at 663 (citations omitted). While this court recognizes that these factors, dealing with deple-

tion allowances, are not controlling in a case such as this involving reclamation fees, they do provide a standard by which it may be determined whether the independent mining companies have an economic interest in the coal in place. It is this determination, in the absence of a conclusive resolution of the question of an agency relationship, which this court feels is dispositive of the issue of liability for payment of reclamation fees.

Six of the seven factors enunciated in *Parsons*, and later reaffirmed by the Supreme Court in *Paragon Jewel Coal Company v. Commissioner*, 380 U.S. 624, 85 S.Ct. 1207, 14 L.Ed.2d 116 (1965), are present in the instant case. The only factor that differs here is that the contracts were not terminable without cause on short notice. Rather, each of the contracts was of specific duration, with the usual term being one year. The fact that the contracts are not terminable at will, however, has been determined by the Supreme Court not to be dispositive of the issue of economic interest, *see United States v. Swank*, 451 U.S. 571, 582, 101 S.Ct. 1931, 1938, 68 L.Ed.2d 454 (1981), but is merely one of the factors to be considered. In the present case, it is undisputed that the investments of the mining companies are in their equipment, that this equipment is movable, and that their investments are recoverable through depreciation. In addition, Rapoca Energy Company has never surrendered to the mining companies any capital interest in the coal in place. Rather, it merely conveys to the companies the right to mine and remove the coal from the locations covered by the contracts. In fact, each written contract specifically states that the "Contractors sole interest in the Licensed Premises shall be limited to the coal actually mined by it."

Factors six and seven of the *Parsons* test, whether the companies are bound to

---

1. In *Commissioner v. Southwest Exploration Co.,* 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956), the Supreme Court defined "economic interest" as consisting of two factors, to be considered together. The factors were: " '(1) acquir[ing], by investment, any interest in the

[coal] in place', and 'secur[ing] by legal relationship 'income derived from the extraction of the [coal], to which he must look for a return of his capital.' " *Id.* at 314, 76 S.Ct. at 398, *quoting Palmer v. Bender,* 287 U.S. 551, 557, 53 S.Ct. 225, 226, 77 L.Ed. 489 (1933).

deliver the mined coal to the landowners or instead may sell it to the highest bidder and whether the companies are paid a fixed price per ton for the coal or instead may sell the coal at whatever price the market may bear, also dictate a finding that the "independent contractors" employed by Rapoca have no economic interest in the coal in place. In both *Parsons* and *Paragon Jewel Coal Company* the contractors were required to deliver the mined coal to the landowner's tipple and in turn received compensation at a fixed rate per ton. In both cases the Supreme Court determined that the contractors had a mere economic advantage in mining the coal, and thus were not entitled to the depletion allowance. In *United States v. Swank*, however, the mining companies "had a legal interest in the mineral both before and after it was mined, and were free to sell the coal at whatever price the market could bear." *Swank*, 451 U.S. at 582, 101 S.Ct. at 1938. As a result, the Court found that the lessees retained an economic interest in the mineral deposits. In the present case the written contracts specifically provide that "[a]ll coal mined from the Licensed Premises by Contractor or its agents shall be delivered to the Norton Coal Company Tipple" [2] ... and that "[f]or its services of extracting coal from the Licensed Premises and delivering such coal to the Tipple, Owner shall pay to Contractor the current dock price ... per ton" of coal mined. It is thus clear that the mining companies are not free to sell the mined coal to whomever they please, but must instead deliver the coal to Rapoca's processing facilities, at which time they are paid a fixed amount per ton of coal delivered.

It is also clear, as in both *Parsons* and *Paragon Jewel Coal Company*, that the mining companies are bound to look only to Rapoca Energy Company for all sums due them under their contracts. "The agreement of the landowners to pay a fixed sum per ton for mining and delivering the coal 'was a personal covenant and did not purport to grant [the contractors] an interest in the coal [in place].'" *Parsons v. Smith*, 359 U.S. 215, 225, 79 S.Ct. 656, 663, 3 L.Ed.2d 747 (1959), *quoting Helvering v. O'Donnell*, 303 U.S. 370, 372, 58 S.Ct. 619, 620, 82 L.Ed. 903 (1938). The seven factors enunciated in *Parsons* thus show that the companies with whom Rapoca Energy Company contracts to mine its coal reserves have no economic interest in the coal in place.

Since Rapoca Energy Company has been determined to be the only entity that has an economic interest in the coal in place, and that the independent contractors enjoy no more than an economic advantage in the mineral deposits, this court feels that it must therefore also determine that it is Rapoca Energy Company that is liable for the payment of reclamation fees.

Finally, though this court has been unable to find any reported cases dealing with the precise issue presented for consideration today, the courts of Ohio, Kentucky, and Alabama have dealt with similarly worded statutes involving the "severing" of minerals from the soil. *N & G Construction, Inc. v. Lindley*, 56 Ohio St.2d 415, 384 N.E.2d 704 (1978), dealt with the question of ultimate liability for severance taxes under a statute which imposed such liability on the "severer" of natural resources. "Severer" was further defined as "any person who actually removes the natural resources from the soil or water in this state." R & F Coal Company, the owner of the coal and contractor for its excavation, argued that it could not be liable for the severance tax since it did not physically remove the coal from the ground. The Ohio Supreme Court disagreed, finding that "it would be unreasonable ... to render [N & G] liable for the severance tax, in effect recognizing as a basis for that determination the agency relationship between [N & G] and its employees who actually severed the coal, but on the other hand refusing to recognize the enterprise agency

---

**2.** Rapoca Energy Company consists of two divisions: Black Watch/Black Diamond Division and Norton Division. The contracts between the mining companies and Norton Division are written while those with Black Watch/Black Diamond are oral.

between [N & G] and the R & F Coal Company. *N & G Construction, Inc.*, 56 Ohio St.2d at 417, 384 N.E.2d at 706. The court held that a "reasonable and workable scheme ... must obligate the enterprise which ultimately directed the severance" to be held liable for the tax. *Id.*[3]

In *Commonwealth v. Majestic Collieries Co.*, 594 S.W.2d 877 (Ky.1979), *reh'g denied* (Ky.1980), the court addressed the question of whether mineral owners or their contract miners were responsible for the payment of the severance tax. The mineral owners argued that the contractors were the "taxpayers" under the statute because they were the ones who "severed" the coal from the ground. The court disagreed, stating that:

> Majestic and Sovereign [the mineral owners] owned the right to extract the coal and sell it. They arranged with the contract miners to perform the mining and transportation tasks for them. They paid the contract miners a per ton compensation for the cost of removing the coal. The contract miners never owned the coal nor sold it to Sovereign and Majestic. Rather the contract miners dug the coal which Sovereign and Majestic wanted mined ...
>
> . . . .
>
> ... The argument of Majestic and Sovereign, taken to its logical conclusion, would result in the coal severance tax being levied upon the individual pick miner or machine operator merely because he is the one who physically removes the coal from the earth. Majestic and Sovereign were engaged in severing the coal from their leasehold, and the payments to the contract miners were a business expense necessary to get the coal out of the ground and to the rail car where it could be sold at the market price. In short, the contract miners were the tools with which Majestic and Sovereign severed the coal.

*Majestic*, 594 S.W.2d at 878.

Finally, Alabama, under a similarly worded "severance" statute, has become the third state to hold that "the legislature intended for the entity which owns the right to extract the coal to be the one that should pay the severance tax." *State v. Burgess Mining and Construction Co.*, 464 So.2d 95, 97 (Ala.Civ.App.1984), *reh'g denied*, (Ala.1985). "Otherwise, carried to its logical conclusion, the person who will ultimately be liable for the tax is the person who actually operates the machinery or who handles the shovels, since he is the one who actually severs the coal from the soil." *Id.*

■■ This court feels that in determining liability for payment of reclamation fees by the entity who "removes" the coal from the ground, just as in cases involving payment of state severance taxes by the "person who actually removes the natural resources from the soil", the legislature intended that ultimate liability should rest with the entity that owns the right to extract the coal. Here, the "independent contractors" owned no economic interest in the coal in place. Rather, they enjoyed a mere "economic advantage" derived from production, through a contractual relation to the owner and were in fact no more than the tools by which Rapoca was able to extract its coal. Rapoca Energy Company is liable for payment of the reclamation fees.

The plaintiff's motion for summary judgment is GRANTED. The parties have stipulated that, if Rapoca were determined to be liable for the payment of the reclamation fees, the amount of the judgment to which the plaintiff, the United States of America, would be entitled would be $222,713.45 principal, plus $64,020.56 in prejudgment interest through March 31, 1984, plus an additional $2227.13 in pre-judgment interest for every month or portion thereof from April 1, 1984, until the date of judgment.

An accompanying Order shall be entered this day.

---

3. This position was later reaffirmed in *Young v.* *Lindley*, 61 Ohio St.2d 58, 399 N.E.2d 89 (1980).